UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| PAMELA ZEIGLER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 10-CV-0014-CVE-FHM |
| | ) | |
| J-M MANUFACTURING COMPANY, INC., | ) | |
| d/b/a JM EAGLE, | ) | |
| | ) | |
| Defendant. | ) | |

<u>OPINION AND ORDER</u>

Now before the Court is Defendant's Motion for Summary Judgment and Brief in Support
(Dkt. # 26).  Plaintiff Pamela Zeigler filed a complaint against defendant J-M Manufacturing
Company, Inc., d/b/a JM Eagle (JM Eagle),[1] alleging a federal claim for relief based on violations
of 42 U.S.C. § 1981, as well as state law claims for relief for wrongful termination and intentional
infliction of emotional distress.  Dkt. # 2.  Defendant seeks summary judgment on all claims, and
also seeks to limit plaintiff's recoverable damages.

I.

Defendant, a manufacturer of polyvinyl chloride and polyethylene pipe, operates a
production facility in Tulsa, Oklahoma.  Dkt. # 26, at 5.  The Tulsa facility is divided into two plants
(pipe and fittings), and the fittings plant is further divided into two departments (moldings and
secondary).  Dkt. # 26, at 5.  Plaintiff, an African-American woman, was hired by JM Eagle on April

---

[1]       Plaintiff's complaint was originally filed against U.S. Poly Company, LLC d/b/a J.M. Eagle.
Dkt. # 2.  Defendant filed a notice of correction stating that the correct party name is J-M
Manufacturing Company, Inc. d/b/a JM Eagle.  Dkt. # 12.  During Zeigler's employment
with defendant, JM Eagle was known at times as both US Poly and PW Eagle.  Dkt. # 28-1,
at 3.  Reference to JM Eagle includes any of its predecessor corporations.  <u>Id.</u>

16, 2006 as a full-time employee in the secondary department of the fittings plant.[2]  Id.  She was assigned to the assembly table, where she cleaned, labeled, and assembled parts.  Id. at 5-6.

Ziegler testified that she was told when hired that she would rotate among duties on the assembly line every thirty minutes.  Dkt. ## 28, at 7, 11; 28-1, at 34.  She says that this did not occur, and that other employees on the assembly table[3], Kristina Sorrel, Sheena Smith and Laverne Smith, all of whom are Caucasian,[4] were rotated more frequently from the assembly table to work on other machines than she was.  Id. at 10.  Although Ziegler acknowledges that she was occasionally rotated from the assembly table, she says that it was not in the manner promised because she worked only on a single machine when needed.  Id.  She claims that she complained to Ray Shannon, her supervisor at JM Eagle, about not being rotated[5] and that Shannon acknowledged that her lack of rotation was improper.  However, Ziegler says that, despite her complaint, defendant's employees persisted in failing to rotate her.[6]  Dkt. # 28, at 11.

---

[2]  Although plaintiff was initially trained in Shawnee, Oklahoma, in June 2006 defendant moved its operations to the Tulsa facility.  Dkt. # 28-1, at 12.

[3]  Ziegler testified that there were approximately ten people employed in the secondary department overall.  Dkt. # 28-1, at 21.

[4]  Plaintiff testified that the only other African-American employees assigned specifically to the secondary department were Margo Battle and Ray Fisher.  Dkt. # 28-1, at 20-21.  Ziegler acknowledges that both Battle and Fisher occasionally rotated between machines and other areas.  Id.; Dkt. # 28-1, at 33.

[5]  This complaint occurred on plaintiff's second day of employment with JM Eagle.  Dkt. # 28-1, at 33.

[6]  Ziegler testified that no one was responsible for telling the employees when to rotate; however, she said it was her understanding that she was supposed to go through defendant's chain of command regarding rotation rather than work out a rotation arrangement with her co-workers on her own.  Dkt. # 28-1, at 34.

When plaintiff was required to rotate onto a machine, she alleges that she did so without proper training.  She claims that she was denied training because of her race, and that Caucasian employees received training for the machines they operated.  Dkt. # 28-1, at 36, 38-39.  Her complaint alleges that Caucasian employees with less experience than plaintiff were selected to attend training courses, and that they received promotions as a result.[7]  Dkt. # 2, at 3-4.  Plaintiff claims that she complained to Craig Kerr, the JM Eagle employee in charge of the plant, about not being trained for machines to which she was assigned, and that she told Kerr that she believed the lack of training was the result of prejudice.  Id. at 36, 38.  She further alleges that Kerr did not respond to her complaints.

Ziegler alleges that, as a result of her lack of training, she occasionally made mistakes when operating the machines, and that she was disciplined more harshly than her Caucasian co-workers when that occurred.  As an example, she alleges in her complaint that "[o]n two occasions, [she] made mistakes while working on the machines because she was not trained on how to use them and she was disciplined."  Dkt. # 2, at 3-4.  Ziegler clarified at her deposition that the discipline referred to in the complaint was a verbal reprimand she received and the fact that she was required to return to her regular duties of stacking bags and loading pallets after making the mistake.[8]  Dkt. ## 28, at

---

[7]     JM Eagle acknowledges that, in June 2006, it decided to send certain employees to an outside training class to improve their knowledge and experience on two machines.  Dkt. # 26, at 17.  It states that the selection criteria for those classes were "those employees with prior experience on the SH-50 machine, those who used the SH-50 most frequently, and lead positions."  Id.  Further, it states that those selected to receive training did not receive any pay increase or promotion as a result of the training.  Id.  Defendant claims that plaintiff was not asked to attend because she, "like many other employees in the fittings plant, was not working on the SH-50 machine at the time."  Id.

[8]     Plaintiff acknowledges that she has never received a written warning from defendant regarding her work performance.  Dkt. # 26, at 9.

10; 28-1, at 12.  Ziegler states that, when her co-worker Sorrel made the same mistake, she was not disciplined but was allowed to correct her mistakes and continue the same job.[9]  Dkt. # 28, at 10. Plaintiff also cites as an instance of discipline that, when her co-worker Josh Giddel failed to appear for work for two weeks or to call in, he was allowed to retain his position upon his return.  Id.

Apart from defendant's failure to train her, plaintiff also claims that she was subjected to racial prejudice in other ways while employed by defendant.[10]  Plaintiff testified that, on the day she first complained to Shannon about her lack of rotation, she and Battle made a complaint to Kerr about their Caucasian co-workers taking smoke breaks and leaving them alone on the floor.[11]  They told Kerr they felt there was a difference in treatment between the Caucasian and African-American employees.  However, plaintiff says Kerr denied any prejudicial treatment and told her that he never wanted to hear the word "prejudice" again.  Dkt. # 28-1, at 35.  Plaintiff alleges that the perceived unequal treatment occurred again the next day, and that she complained again to Kerr; she says he responded that if she didn't like it, she could leave.  Id.  Ziegler also claims that she made complaints to Kerr on several other grounds.  Ziegler testified that she was subjected to racially

---

[9]  Ziegler testified that she did not know whether Sorrel received a verbal warning about her mistake or whether anything was put in her file.  Dkt. # 28-1, at 42.

[10]  Although not included in her complaint or her statement of undisputed material facts, plaintiff testified at her deposition that defendant engaged in racial discrimination when it hired an African-American man for a temporary position on a machine, sent him for a drug test when he was injured using that machine, and terminated him when he tested positive for drugs.  Dkt. # 28-1, at 37.  Plaintiff claims that a Caucasian employee was similarly injured using the same machine but was not sent for a drug test.  Id.  This allegation has no evidentiary support and is not relevant to plaintiff's claims.

[11]  Ziegler states that she was left on the assembly floor by herself when her co-workers went outside to smoke.  Dkt. # 28-1, at 34.  She does not allege that she was required by defendant to stay on the floor, or that she was prevented in any way from joining her co-workers.

4

hostile language[12] from Dale Dunn, another supervisor at JM Eagle, and that she complained about that treatment on multiple occasions.[13]  Dkt. ## 28, at 13; 28-1, at 35.  Finally, plaintiff says she complained to Kerr about the fact that her co-workers Sorrell and Stephanie Carr left work early every day, leaving her alone on the assembly line.  Dkt. # 28-1, at 37.  She alleges that "[n]o blacks got to do that."[14]  Id.

Plaintiff alleges that she made at least two requests regarding a potential transfer to another department.  The first occurred when defendant's facility was still in Shawnee.  Ziegler claims that things weren't "going right in secondary," and that she was "seeing a lot of prejudice," so she asked Kerr to transfer her to a different department.[15]  Dkt. # 28-1, at 18.  Plaintiff was not transferred as a result of that request; she does not know whether there were any positions open at the time.  Id. She claims that she made another general request to Kerr for a transfer soon after JM Eagle transferred its operations to Tulsa.  Id. at 19.  However, she alleges that Kerr told her that she "got hired in secondary so that was where [she] was going to have to stay," and that she was not transferred.  Id.  Again, plaintiff has no knowledge of open positions at the time of her request.  Id.

---

[12]  Plaintiff testified that Dunn "was always walking around saying the N word to people." Dkt. # 28-1, at 35.  Defendant does not dispute that Dunn engaged in that behavior.  Dkt. # 30, at 5.

[13]  Plaintiff further alleges that, although she complained about Dunn, he remained in his position and the situation was not remedied.  Dkt. # 28, at 13.  However, plaintiff acknowledged at her deposition that Dunn's employment with JM Eagle ended before her leave began in November 2006.  Dkt. # 28-1, at 35-36.

[14]  Ziegler does not claim that she requested to leave early and was denied.  Dkt. # 28-1, at 37. She also acknowledges that Sorrel was terminated in August 2006 as the result of complaints made about leaving work early every day.  Dkt. # 28-1, at 47.

[15]  Plaintiff's testimony is conflicting as to whether she made a general request for a transfer, or whether she specifically asked to be transferred to the "med fit" machine in the moldings area.  Dkt. # 28-1, at 18-19.

Plaintiff testified that a transfer to running a machine would have been a promotion and brought a corresponding rise in pay.[16] Id. at 20.  She alleges that Josh Goodel received training on a machine and was then moved to a supervisory position.  Id. at 39.  Plaintiff could not verify whether Goodel actually received a promotion or increase in pay, but alleges that he performed different tasks following his training.[17]  Id.

On October 13, 2006, Ziegler met with her primary care physician, James Russell, M.D., about pain in her hands and arms.  Dkt. # 26, at 6.  Dr. Russell released Ziegler to return to work without restrictions on October 16, 2006.  Dkt. # 26-6.  Plaintiff took to Kerr a note from Dr. Russell regarding her release, informing Kerr for the first time that she might have work-related pain.  Dkt. # 26, at 6.  Ziegler alleges that Kerr began "quizzing" her as to whether she hadn't injured her hands at home and making other inquiries about whether her condition was work-related.[18] Dkt. # 28, at 14.  On October 17, 2006, plaintiff went to see Dr. Russell a second time regarding continued pain in her hands.  Dr. Russell released her with a note stating that she could not work until seeing an orthopedic specialist.  Id.  On October 18, 2006, plaintiff took the note from Dr. Russell to Kerr, informing him that her hand pain was work-related.  Dkt. # 26, at 6.  Plaintiff alleges that Kerr again questioned her about the source of her injury.  Dkt. # 28, at 14.  However, plaintiff was given the time away from work directed by Dr. Russell.  Dkt. # 26, at 6.

---

[16]     Plaintiff characterizes her request to be rotated onto a machine as a request for a promotion. Dkt. # 28-1, at 20.

[17]     As noted, defendant disputes that the training classes about which plaintiff complains resulted in a promotion or pay increase for any employee.

[18]     Plaintiff testified that Laverne Smith was present during this conversation with Kerr, and that Smith stated that Ziegler's injuries "sound[ed] like carpal tunnel."  Dkt. # 28-1, at 16.

On October 27, 2006, plaintiff was released by an orthopedic specialist to return to work with a six hour shift restriction. Dkt. # 26-8. Plaintiff gave a copy of the note with her work restriction to defendant's human resources manager, Judy Hamilton, and plaintiff was allowed to work in compliance with her new restriction. Dkt. # 26-3, at 9. On November 9, 2006, plaintiff filed a workers' compensation claim alleging that she had suffered a job-related injury to both her wrists and hands from repetitive activity.[19] Dkt. ## 26, at 7; 26-9. On November 17, 2006, plaintiff saw her orthopedic specialist, who determined that plaintiff should not work until she had surgery on her hands. In accordance with the instructions of the specialist, defendant placed plaintiff on leave for her hand surgery. Id.

On June 4, 2008, plaintiff underwent surgery on both hands. Plaintiff's surgeon released her to return to work on June 6, 2008, with permanent restrictions against lifting more than ten pounds or engaging in repetitive, heavy gripping with either hand.[20] Id. at 7-8. Plaintiff subsequently informed Hamilton of her release and permanent work restrictions. Id. at 8. On June 13, 2008, the plant manager, Darren Warn[21], called and informed plaintiff that defendant did not have any positions meeting plaintiff's permanent restrictions to which she could return.[22] Id.

---

[19]  Plaintiff's complaint alleges that Kerr attempted to thwart her attempts to fill out an incident report and to file her workers' compensation claim. Dkt. # 2, at 4. However, there is no evidence in the summary judgment record that Kerr or any other JM Eagle employee ignored her requests or otherwise interfered in any way with plaintiff's attempts to file a compensation claim.

[20]  Ziegler testified that at least two doctors stated she should not continue working in a manufacturing setting like JM Eagle. Dkt. # 28-1, at 27.

[21]  Plaintiff's complaint states that it was Kerr who told her that defendant no longer had a position available for her. Dkt. # 2, at 4. However, she does not dispute that it was Warn who called her in June 2008. Dkt. ## 26, at 8; 28, at 7.

[22]  Plaintiff did not ask Warn to create a new position for her. Dkt. # 28-1, at 42-43.

Ziegler acknowledges that her permanent restrictions would have prevented her return to the assembly table position she held prior to her injury.  Id.  She is not aware of any specific position at JM Eagle that would have accommodated her restrictions.  Id.; Dkt. # 28, at 9.  However, she alleges that she could have worked in a "light duty" position, and that she had previously performed tasks for defendant that she would have been capable of performing with her disability.  Dkt. # 28, at 9, 15.  Moreover, she claims that other employees were placed in "light duty" positions when necessary to accommodate their disabilities.[23]  Dkt. # 28, at 9.  Plaintiff is not aware of any employee for whom defendant ever created a permanent "light duty" position.  Dkt. # 26, at 8.

In 2009, plaintiff applied for disability benefits with the Social Security Administration.  Id. She has since been approved for and is receiving Social Security disability benefits based upon a determination that she has been disabled since September 1, 2007.  Id. at 9.  Although Ziegler believes that her medical condition currently prevents her from any work, she did not believe that to be the case at the time her employment with defendant was terminated in June 2008.  Dkt. # 28, at 9.  Plaintiff alleges that the disparate treatment, racial discrimination, and wrongful termination by defendant have caused her physical, mental, and emotional distress, including depression[24], stress, chest pain, loss of sleep, and hair loss.  Dkt. # 28, at 15-16.

---

[23]     Ziegler alleges that Sorrel and Sheena Smith both received accommodations from defendant for their injuries.  For instance, plaintiff testified that Smith broke her arm at home, but was allowed to continue working with a broken arm.  Dkt. # 28-1, at 25-26.  She also testified that when Sorrel was injured at home, defendant created a position for her in secondary that involved light work like sorting boxes, affixing labels, and similar tasks.  Id. at 26.  Smith had not yet returned to full duty when Ziegler left in November 2006; Sorrel had returned to full duty at that time.  Id.

[24]     Plaintiff testified that Dr. Russell at one time told her that she suffered from depression.  Dkt. # 28-1, at 45.

## II.

Summary judgment pursuant to Fed. R. Civ. P. 56 is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986); Kendall v. Watkins, 998 F.2d 848, 850 (10th Cir. 1993).  The plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  Celotex, 477 U.S. at 317. "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'"  Id. at 327.

"When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. . . .  Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'"  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986) (citations omitted).  "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the [trier of fact] could reasonably find for the plaintiff."  Anderson, 477 U.S. at 252.  In essence, the inquiry for the Court is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  Id. at 250.  In its review, the Court construes the record in the light most favorable to the party opposing summary judgment. Garratt v. Walker, 164 F.3d 1249, 1251 (10th Cir. 1998).

9

III.

A.      **Federal Law Claims Under 42 U.S.C. § 1981**

Section 1981 prohibits discrimination in employment on the basis of race.  <u>CBOCS West,</u>

<u>Inc. v. Humphries</u>, 553 U.S. 442, 459 (2008).  Ziegler alleges that JM Eagle violated § 1981 when

it subjected her to disparate discipline and discharge as a result of her race.  On a motion for

summary judgment on a § 1981 claim, if plaintiff does not present direct evidence of discrimination,

the claim is analyzed under the burden-shifting framework of <u>McDonnell Douglas Corporation v.</u>

<u>Green</u>, 411 U.S. 792 (1973).  Under that analysis, plaintiff has the burden to make a prima facie

case.  The burden then shifts to defendant to articulate a legitimate, nondiscriminatory reason for

its employment decision.  If it does, plaintiff then has the burden to produce evidence that defendant

discriminated on the basis of race, which she may satisfy with evidence that the legitimate,

nondiscriminatory reason for defendant's employment decision was merely pretextual.  <u>See, e.g.,</u>

<u>Orr v. City of Albuquerque</u>, 417 F.3d 1144, 1149 (10th Cir. 2005).

1.      **Disparate Discipline**

Plaintiff alleges first that defendant violated § 1981 when it subjected her to discipline more

severe than that experienced by her Caucasian co-workers.  To make a prima facie case of disparate

discipline, plaintiff must show: (1) she is a racial minority; (2) she was disciplined by JM Eagle; and

(3) JM Eagle imposed the discipline under circumstances giving rise to an inference of racial

discrimination.  <u>Jones v. Denver Post Corp.</u>, 203 F.3d 748, 753 (10th Cir. 2000).[25]

---

[25]     "The elements of a plaintiff's case are the same . . . whether that case is brought under §§
         1981 or 1983 or Title VII."  <u>Drake v. City of Fort Collins</u>, 927 F.2d 1156, 1162 (10th Cir.
         1991).

10

It is undisputed that Ziegler is a member of a protected minority group.  However, defendant argues that she has not shown that she was disciplined for purposes of a prima facie case under § 1981.  Dkt. ## 26, at 13-14; 30, at 8-9.  The Tenth Circuit has not defined precisely which behaviors by an employer qualify as discipline under § 1981.  However, it has held that to make a prima facie case of general discrimination under that section, plaintiff must demonstrate: 1) membership in a protected class; 2) adverse employment action; and 3) disparate treatment among similarly situated employees.  Fulcher v. City of Wichita, No. 09-3301, 2010 WL 2825690, at * 3 (10th Cir. July 19, 2010)(unpublished)[26].  Reading the prima facie requirements for a disparate discipline claim in concert with this more general test, the Court finds that the discipline at issue in a § 1981 disparate discipline claim must rise to the level of an adverse employment action.  Cf. Duran v. New Mexico Dep't of Labor, 143 F.Supp.2d 1278, 1288 (D.N.M. 2001)("to be actionable . . . the allegedly disparate discipline imposed must still rise to the level of an adverse employment action").[27]

Black's Law Dictionary defines "discipline" as "[p]unishment intended to correct or instruct."  Black's Law Dictionary (9th ed. 2009).  Thus, discipline for purposes of a § 1981 claim is punishment intended to correct or instruct that rises to the level of an adverse employment action.  An adverse employment action is a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significant different responsibilities, or a decision causing a significant change in benefits."  Stinnett v. Safeway, Inc., 337 F.3d 1213, 1217 (10th Cir. 2003).

---

[26]   Unpublished decisions are not precedential, but may be cited for their persuasive value.  See Fed. R. App. 32.1; 10th Cir. R. 32.1.

[27]   The parties do not appear to dispute this conclusion, as both rely on case law regarding "adverse employment actions" in support of arguments about disparate discipline.  See, e.g., Dkt. ## 26, at 13-14; 28, at 19-20.

The Tenth Circuit liberally interprets "whether an adverse employment action exists[,] and take[s] a case-by-case approach, examining the unique factors relevant to the situation at hand." Haynes v. Level 3 Commc'ns, LLC, 456 F.3d 1215, 1222 (10th Cir. 2006).

Plaintiff claims that actionable discipline was directed at her in a number of instances. Dkt. # 28, at 17-19. Those incidents include a verbal reprimand she received when she made a mistake on a machine, the occasions when she was forced to work on a machine without proper training and to return to the assembly table when she made a mistake, the failure of JM Eagle to punish repeat absences of one of its employees, racial slurs by another of defendant's employees, and defendant's withholding of training,[28] promotion, and rotation opportunities given to Caucasian employees. Dkt. ## 28, at 18-19. The verbal warning given to plaintiff as a result of a mistake she made on a machine is the sole incident that appears clearly to meet the definition of discipline,[29] as it was a reaction to a mistake by plaintiff that could arguably result in a change to her employment status. Plaintiff's characterization of other actions, like defendant's failure to give her certain training or promotions, as "discipline" is without evidentiary support, as there is no evidence in the summary

[28]     The parties disagree as to the admissibility of plaintiff's testimony that she overheard other JM Eagle employees discussing how they skipped their assigned training classes. Dkt. ## 28, at 18; 30, at 7-8. However, even construing Ziegler's disparate discipline claim as broadly as possible, such statements by other employees are not relevant. The question of whether Caucasian employees attended assigned training courses has no bearing on plaintiff's claim that she was disciplined by not being assigned to the courses as well.

[29]     Defendant argues that the verbal warning was not discipline, citing EEOC v. PVNF, 487 F.2d 790 (10th Cir. 2007), for the proposition that even a written warning is an adverse employment action only under particular circumstances. Dkt. # 26, at 13. Defendant's argument appears to be that because a written warning is discipline only in certain circumstances, a verbal warning never rises to that standard. However, the Tenth Circuit has – without discussion – referred to a verbal warning as discipline, Rivera v. City and Cty. of Denver, 365 F.3d 912 (10th Cir. 2004), and the Court will assume for the purposes of this motion only that it constituted discipline. Id. at 923.

judgment record that the behaviors about which Ziegler complains were intended as any form of punishment or were directed toward plaintiff.  However, because this claim can be resolved upon consideration of the third element, the Court will assume that all of the conduct about which Ziegler complains was discipline.

Even assuming that Ziegler, a member of a protected minority class, was subject to discipline by JM Eagle, she fails to make her prima facie case because she has not shown that the discipline was imposed under circumstances giving rise to an inference of racial discrimination.  A "significant factor" in establishing such an inference is whether the employees receiving the allegedly differential treatment were similarly situated with the plaintiff.  Magruder v. Runyon, No. 94-3069, 1995 WL 311740, at * 3 (10th Cir. May 22, 1995)(unpublished)[30].  "The burden is on the plaintiff to show the similarity between [her] conduct and that of [her] comparator."  Garcia v. Cargill, Inc., No. 08-4153-SAC, 2010 WL 4160118, at * 6 (D. Kan. April 21, 2010).  "Individuals are considered similarly-situated when they deal with the same supervisor, are subjected to the same standards governing performance evaluation and discipline, and have engaged in conduct of comparable seriousness."  E.E.O.C., 487 F.3d at 800-01 (internal quotations omitted).

Ziegler's first claim of discipline concerns the verbal warning she received.  She states that she and Sorrell made the same mistake on a machine, but that Ziegler was given a verbal warning and forced to go back to the assembly line while Sorrell was allowed to correct her mistakes and continue working.  Dkt. # 26-3, at 29.  Although this is plaintiff's clearest allegation regarding disparate discipline, it still does not reach the threshold necessary for an inference of discrimination.

---

[30]    Unpublished decisions are not precedential, but may be cited for their persuasive value.  See Fed. R. App. 32.1; 10th Cir. R. 32.1.

Plaintiff alleges that she and Sorrell engaged in the same conduct, but does not provide any information about what that conduct was, whether the two women had comparable employment history, or anything else providing context for the allegedly disparate discipline.[31]  "[W]ithout a frame of reference in which to consider the information [Ziegler] presents, it is markedly difficult to ascertain how a fact-finder could infer discriminatory motive on [d]efendant's part." Landrey v. City of Glenwood Springs, No. CIVA03CV01299EWNBNB, 2006 WL 726634, at * 16 (D. Colo. March 22, 2006).

That lack of information is even more problematic with regard to Ziegler's other claims of disparate discipline.  Plaintiff makes no attempt to show similar status or conduct between herself and any other JM Eagle employee allegedly subject to differences in discipline; she does not describe employment histories, conduct, relevant supervisors, or provide any other context for her claims.  Instead, she relies on conclusory allegations that defendant's decisions not to rotate, promote, or send her to training classes were based on race.  Without more, these allegations do not satisfy plaintiff's burden of showing that she was similarly situated to other JM Eagle employees, and therefore they do not create a genuine issue of material fact as to circumstances giving rise to an inference of discrimination.  See, e.g., Woods-Gaston v. Sequoyah Ents., Inc., 340 F. App'x 450, 452 (10th Cir. 2009)(unpublished)[32](observing that allegations of differences in discipline on racial lines might have, with supporting evidence, been sufficient to create an inference of discrimination on the part of employer); Lollis v. City of Eufala, 249 F. App'x 20, 26-27 (10th Cir. 2007)(rejecting

---

[31]  Plaintiff even admits that she does not know whether Sorrell also received a verbal warning after her mistake.  Dkt. # 26-3, at 29.

[32]  Unpublished decisions are not precedential, but may be cited for their persuasive value.  See Fed. R. App. 32.1; 10th Cir. R. 32.1.

plaintiff's claims of discrimination where he failed to show how he was similarly situated to other employees, or to allege how conduct engaged in by other employees was similar to his own); Landrey, 2006 WL 726634, at * 16-17 (finding that defendant was entitled to summary judgment on plaintiff's § 1981 claim because plaintiff "offer[ed] no evidence to establish that she was similarly situated to the employees who allegedly received better treatment" than she did).

Although the Tenth Circuit has noted that "courts must be sensitive to the myriad of ways [an inference of racial discrimination] can be created," plaintiff has not shown that she was similarly situated to those employees who allegedly received different treatment than she did, nor has she proffered any other evidence that creates a genuine issue of material fact as to race-based motivation.[33] Hysten v. Burlington Northern and Santa Fe Ry. Co., 296 F.3d 1177, 1181 (10th Cir. 2002).  Thus, plaintiff has not made her prima facie case, and defendant is entitled to summary judgment as to Ziegler's disparate discipline claim under § 1981.

**2.      Disparate Discharge**

Plaintiff's first claim for relief also states a claim for discriminatory discharge under § 1981. To establish her prima facie case, she must show "(1) [s]he belongs to a protected class; (2) [s]he was qualified for [her] job; (3) despite [her] qualifications, [s]he was discharged; and (4) the job was not eliminated after [her] discharge." Guyton v. Ottawa Truck Div., Kalmar Indus. U.S.A., Inc., 15

---

[33]      Indeed, because plaintiff acknowledges that other African-American employees in her department were permitted to rotate, and that some outside her department received promotions, Dkt. ## 26, at 6; 28, at 22 n.4, the summary judgment record is devoid of any evidence of broad discriminatory policies that resulted in "discipline" to plaintiff.  Instances of racial slurs by Dunn are certainly indicative of racial animus; however, plaintiff has alleged no connection between those remarks by Dunn and any action taken toward her by defendant.

F. App'x 571, 575-76 (10th Cir. 2001)(unpublished)[34].  If plaintiff makes her prima facie case, the burden-shifting framework of McDonnell Douglas applies.

JM Eagle assumes that Ziegler can establish the first, third, and fourth elements of her prima facie claim. Dkt. # 26, at 14.  However, it argues that as a result of work restrictions following her hand surgery, she was no longer qualified for her position and cannot establish the second element. The Tenth Circuit has cautioned against conflating an employer's arguments at the prima facie stage with those in the second part of the burden-shifting analysis, as "placing a plaintiff's qualifications in issue at both the prima facie case and pretext stages of a termination case is an unnecessary redundancy." See MacDonald v. E. Wyoming Mental Health Cent., 941 F.2d 1115, 1119-1120 (10th Cir. 1991).  For that reason, a showing of qualification for a position sufficient for a prima facie case will be made if the "plaintiff ha[s] not suffered physical disability or loss of a necessary professional license or some other occurrence that render[s] [her] unfit for the position for which [s]he was hired." Id.  However, Ziegler admits that she would have been unable to perform her job responsibilities following her injury and rehabilitation, which "may be regarded as an admission that [she] was unqualified for employment, absent evidence that the . . . [employer's] system was . . . slanted against blacks." Witherspoon v. Nash-Finch Co., No. 97-3097, 1998 WL 658357, at * 4 (10th Cir. Sept. 15, 1998)(unpublished)[35].  Despite plaintiff's numerous claims of prejudice, she does not allege that defendant's established job qualifications were racially discriminatory.  Thus,

---

[34]   Unpublished decisions are not precedential, but may be cited for their persuasive value. See Fed. R. App. 32.1; 10th Cir. R. 32.1.

[35]   Unpublished decisions are not precedential, but may be cited for their persuasive value. See Fed. R. App. 32.1; 10th Cir. R. 32.1.

Ziegler's admitted inability to perform her job functions made her unqualified for the position, and she fails to make a prima facie case of disparate discharge.

Even if Ziegler had made her prima facie case, her claims would fail in a later stage of the McDonnell Douglas analysis. After the prima facie case, the burden shifts to JM Eagle to articulate a legitimate, nondiscriminatory reason for its employment action; its burden in doing so is "exceedingly light." Montes v. Vail Clinic, Inc., 497 F.3d 1160, 1173 (10th Cir. 2007). If defendant proffers a reason, plaintiff must show "there is a genuine issue of material fact regarding whether the . . . justification [is] pretextual." Id. To show that a reason offered is mere pretext, plaintiff must show it to be "so incoherent, weak, inconsistent, or contradictory that a rational factfinder could conclude the reasons were unworthy of belief." Id. "Even though all doubts concerning pretext must be resolved in plaintiff's favor, a plaintiff's allegations alone will not defeat summary judgment. Mere conjecture that the employer's explanation is pretext is insufficient basis to defeat summary judgment." Jencks v. Modern Woodmen of Am., 479 F.3d 1261, 1267 (10th Cir. 2007).

Defendant states that its decision not to reinstate Ziegler was based on a lack of available positions for someone with her work restrictions. Dkt. # 26, at 15. With that articulated legitimate reason for the employment decision, the burden shifts to plaintiff to show the reason is pretextual. In support, Ziegler states that she was capable of performing other duties, and that defendant could and should have created a position to accommodate her injuries in the same way it did for Sorrel and Sheena Smith. Dkt. # 28, at 21. "An employee may show pretext on a theory of disparate treatment by providing evidence that [s]he was treated differently from other similarly situated, non-protected employees." Guyton, 15 F. App'x at 579-80. Sorrel and Smith are both Caucasian employees, and therefore fall outside the protected group to which Ziegler belongs. However, as previously

17

discussed, Ziegler has not shown that she was similarly situated with her co-workers. To the contrary, both Sorrel and Smith received only temporary relief by way of "light duty" positions until they were able to return to their permanent assignments.[36] Dkt. # 28-1, at 25-26. Temporary accommodation of an injury is quite different from the creation of an entirely new permanent position. Because plaintiff's needs were permanent rather than temporary, she has not shown herself to be similarly situated to employees who received allegedly disparate treatment.[37]

Ziegler further claims that her pretext argument is "highlighted by the numerous instances of discriminatory discipline and other differences in treatment" that she alleges resulted from her race. Dkt. # 28, at 22. However, "the passage of time can . . . render a [behavior] too remote to support a finding of pretext." Wagoner v Pfizer, 2010 WL 3199778, at * 6 (10th Cir. Aug. 12, 2010)(finding, in age discrimination case, that potentially hostile behaviors toward employee nine months before her termination were "too temporally remote to support a finding of pretext"). Here, the behaviors about which plaintiff complains took place from April to November 2006. Ziegler was not terminated until July 2008. Plaintiff does not provide any reason for why that nearly two-year period does not render the conduct complained of too remote to support a finding of pretext. Moreover, plaintiff's allegations about denial of training and promotions are based only on her own

---

[36]    Similarly, when Ziegler was given work restrictions in October 2006, defendant altered her job requirements to accommodate those restrictions. Dkt. # 26-3, at 9.

[37]    Ziegler has not cited any additional authority for defendant's obligation to create a new position to accommodate her, nor could she. Even the "reasonable accommodation" requirement of the American Disabilities Act (ADA) – a statute not at issue in this case – does not require creation of a new position for a disabled employee, as an employer is "not required to give what it does not have." See, e.g., Cooper v. United Parcel Servs., 368 F. App'x 469, 477 (5th Cir. 2010)(unpublished). It therefore is left to the plaintiff in ADA cases to prove that an open position existed for which plaintiff was qualified.

18

deposition testimony.  Without more, these allegations are insufficient to defeat summary judgment.

See Jencks, 469 F.3d at 1267.

Finally, while defendant admits that Dunn used racially hostile language in the workplace during plaintiff's employment, his employment at JM Eagle was terminated in November 2006. Dkt. # 26, at 18.  Plaintiff has not alleged that Dunn had any involvement in the decision made in July 2008 not to reinstate her to her former position.  To the contrary, plaintiff admitted at her deposition that she believed that the reason Warn did not create a position for her was because he was worried that she might get hurt again on the job.  Dkt. # 28-1, at 44.  She said that she did not believe there was any other reason that he did not want to create a position for her.  Id.  Thus, plaintiff's allegations of discriminatory conduct during the time of her employment with defendant do not support a finding of pretext.  Defendant is entitled to summary judgment on the disparate discharge claim.

**B.     State Law Claim for Wrongful Termination**

Plaintiff also alleges that she was terminated in retaliation for the workers' compensation claim she filed in November 2006.  Dkt. # 28, at 22.  Under OKLA. STAT. tit. 85, § 5, the Oklahoma Workers' Compensation Act (the Act), no corporation may discharge an employee for filing in good faith a claim for workers' compensation. To establish a prima facie case for retaliatory discharge under § 5, a discharged employee must show "(1) employment; (2) on-the-job injury; (3) medical treatment putting the employer on notice or the good faith start of workers' compensation proceedings; and (4) consequent termination of employment." Taylor v. Cache Creek Nursing Centers, 891 P.2d 607, 610 (Okla. Civ. App. 1994)(citing Buckner v. Gen'l Motors Corp., 760 P.2d 803, 806 (Okla. 1988)).  A showing of "consequent termination" requires production of evidence

that gives rise to "a legal inference [that] the discharge was significantly motivated by retaliation for exercising one's statutory rights." Wallace v. Halliburton Co., 850 P.2d 1056, 1058 (Okla. 1993); see also Taylor, 891 P.2d at 610.  A plaintiff need not meet a "but for" standard for a successful § 5 claim; however, she must "present evidence that does more than show the exercise of her statutory rights was only one of many possible factors resulting in her discharge." Blackwell v. Shelter Mut. Ins. Co., 109 F.3d 1550, 1554 (10th Cir. 1997).  Where an employee's allegations are sufficient to bring her within the section's protection, the employer is called upon to present an alternate reason for the employee's termination. Buckner, 760 P.2d at 807.  However, the employee bears the burden of persuasion that any reason given for termination was pretextual. Id.  "[W]here reasonable people could differ on questions of the employer's retaliatory motive or pretextual explanation, the motion for summary judgment should be denied, and the questions submitted to the jury for resolution." Kennedy v. Builders Warehouse, Inc., 208 P.3d 474, 478 (Okla. Civ. App. 2008)(internal citations omitted).

Defendant assumes plaintiff has made her prima facie case. Dkt. # 26, at 20.  However, it argues that she lacks any evidence to overcome its legitimate, nondiscriminatory reason for her discharge – again, that it did not have any positions available in June 2008 that would accommodate her restrictions.  Id.  Plaintiff testified that she had no proof that her termination had a retaliatory motive.  Dkt. # 28-1 at 43.  However, "a proscribed retaliatory discharge may be shown by circumstantial evidence." Kennedy, 208 P.3d at 478.

Plaintiff first repeats her argument that defendant's proffered reason for her termination is pretextual based on her ability to perform other tasks at JM Eagle and the accommodation of injuries of Caucasian employees through the creation of new job positions.  Based on those facts, Ziegler

20

argues that the decision to terminate her instead of creating a position that would accommodate her restrictions is evidence of a retaliatory motive.  However, § 5(C) of the Act states that:

> After an employee's period of temporary total disability has ended, no [employer] shall be required to rehire or retain any employee who is determined to be physically unable to perform assigned duties.  The failure of an employer to rehire or retain any such employee shall in no manner be deemed a violation of [the Act].

OKLA. STAT. tit. 85, § 5(C).  Thus, by the very terms of the Act upon which Ziegler relies for relief, defendant was under no obligation to rehire her once it was determined that she was unable to perform her assigned job responsibilities, and she cannot rely on such a failure to rehire for her claim under the Act.  As noted, Ziegler admits that she would have been physically unable to perform her former job responsibilities in June 2008.  Therefore, defendant's failure to re-hire her and create a position tailored to her work restrictions is not evidence of pretext.  Her arguments that Caucasian employees received accommodation for their injuries are similarly unhelpful, as plaintiff's claim under the Act is that she was terminated in retaliation for filing a workers' compensation claim, not that she was the victim of racial discrimination.

Plaintiff also argues that Kerr's response when she notified him of her work-related injuries – namely, his "quizzing" of her as to whether her injuries were work-related – creates a showing of pretext.  Dkt. # 28 at 23-24.  "The employer's response to its employees' contemplated or actual commencement of workers' compensation proceedings may . . . constitute evidence of retaliatory motive." Estrada v. Port City Props., Inc., 158 P.3d 495, 499 (Okla. Civ. App. 2007).  Interpreting the evidence in the light most favorable to plaintiff, the Court will take as true her testimony that she was subjected to questioning as to the cause of her injuries when she put JM Eagle on notice of a pending workers' compensation suit by bringing doctor's excusals from work in November 2006.  However, she does not allege that anyone at JM Eagle "made any reference regarding termination

as a result of bringing the Workers' Compensation action." Thompson v. Medley Material Handling, Inc., 732 P.d 461, 464 (Okla. 1987). Moreover, when Ziegler brought her note to Kerr, despite any "quizzing" about her injuries that may have occurred, her restrictions were accommodated and her workers' compensation claim was paid.[38]  Finally, her termination did not occur until June 2008, approximately a year and a half after her initial claim for workers' compensation, and plaintiff does not allege that Kerr had any connection to her termination. None of these allegations would lead "reasonable persons [to] reach different inferences or conclusions from the undisputed facts presented" as to whether a retaliatory motive was present. Taylor v. Cache Creek Nursing Cents., 891 P.2d 607, 610 (Okla. Civ. App. 1994). Where an employer is presented with information about an employee injury, questions from the employer about the nature of that injury should not, without more, give rise to an inference that legitimate reasons given for termination were pretextual. Therefore, plaintiff has not met her burden under § 5, and defendant is entitled to summary judgment on this claim.

## C.    State Law Claim for Intentional Infliction of Emotional Distress

Ziegler also alleges that discrimination suffered during her term of employment with defendant supports a claim for intentional infliction of emotional distress.[39]  Dkt. # 2, at 5-6.

---

[38]    Again, although plaintiff made conclusory allegations in her complaint and during her deposition that Kerr obstructed her filing of a claim and that JM Eagle "didn't want to pay," she has presented no evidence that would substantiate these claims. Dkt. ## 2, at 4; 28-1, at 44.

[39]    Defendant argues that plaintiff's intentional infliction of emotional distress claim is barred by the applicable two-year statute of limitations under Oklahoma law because the conduct complained of occurred prior to the beginning of plaintiff's disability leave in November 2006, and the conduct that occurred in June 2008 is insufficient to support a claim for intentional infliction of emotional distress. Dkt. # 26, at 23. Plaintiff argues that her claim is not barred because the actions upon which it is based are connected to her termination in

22

Oklahoma courts have recognized such a cause of action, also known as the tort of outrage. <u>See</u> <u>Gaylord Entm't Co. v. Thompson</u>, 958 P.2d 128, 149 (Okla. 1998). The action is governed by the restricted standards set forth in the Restatement (Second) of Torts, § 46 (1965). <u>Id.</u> In <u>Breeden v.</u> <u>League Services Corp.</u>, 575 P.2d 1374 (Okla. 1978), the Oklahoma Supreme Court explained:

> Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!' The liability clearly does not extent to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities.

<u>Id.</u> at 1376. To state a claim, a plaintiff must allege that "(1) the defendant acted intentionally or recklessly; (2) the defendant's conduct was extreme and outrageous; (3) the defendant's conduct caused the plaintiff emotional distress; and (4) the resulting emotional distress was severe." <u>Schovanec v. Archdiocese of Oklahoma City</u>, 188 P.3d 158, 175 (Okla. 2008) (quoting <u>Computer</u> <u>Publ'ns, Inc. v. Welton</u>, 49 P.3d 732, 735 (Okla. 2002)). Under Oklahoma law, the trial court must assume a "gatekeeper role" and make an initial determination that the defendant's conduct "may be reasonably regarded as sufficiently extreme and outrageous to meet the Restatement § 46 standards." <u>Trentadue v. United States</u>, 397 F.3d 840, 856 n. 7 (10th Cir. 2005) (applying Oklahoma law). If reasonable persons could reach differing conclusions in the assessment of the disputed facts, the Court should submit the claim to a jury to determine whether the defendant's conduct could result

---

June 2008 and should not be viewed as independent causes of action for purposes of the statute of limitations. Dkt. # 28, at 25. The Court notes that plaintiff's claims do not appear to be connected to her termination; however, for purposes of the summary judgment motion only, it will assume plaintiff's claim is not barred on statute of limitations grounds.

in liability. Id. The Court is to make a similar threshold determination with regard to the fourth prong, the presence of severe emotional distress. Id.

In cases arising out of the workplace, Oklahoma appellate courts have found that a defendant engaged in extreme and outrageous conduct only when that defendant intentionally and persistently engaged in a course of conduct that harmed the plaintiff. See Computer Publ'ns, 49 P.3d at 736 (claim should have been submitted to a jury when plaintiff presented evidence that harassment lasted more than two years and caused plaintiff to quit her job, move, and repeatedly change phone numbers); Miner v. Mid-Am. Door Co., 68 P.3d 212 (Okla.Civ.App.2002) (employer's alleged failure to reassign the plaintiff after learning of workplace harassment, even if unreasonable, was not extreme and outrageous); Gabler v. Holder & Smith, Inc., 11 P.3d 1269 (Okla.Civ.App.2000) (noting that workplace harassment rarely rises to the level of extreme and outrageous conduct); Mirzaie v. Smith Cogeneration, Inc., 962 P.2d 678 (Okla.Civ.App.1998) (employer's conduct was not extreme and outrageous when, inter alia, the plaintiff's manager made derogatory sexual remarks about the plaintiff, woke plaintiff up in the middle of the night to do unnecessary work, and terminated him two hours before his wedding); Zahorsky v. Cmty. Nat'l Bank of Alva, 883 P.2d 198 (Okla. Civ. App.1994) (employer not liable for intentional infliction of emotional distress when an employee forced the plaintiff to have sex with him and employer failed to fire the employee, even though the employer allegedly knew about the conduct).

Plaintiff claims that she has suffered severe emotional distress because of defendant's actions. Dkt. # 2. In support of her claim, she argues that the workplace environment at JM Eagle and her eventual termination caused her extreme stress and depression. Dkt. # 28-1, at 44. More specifically, she argues that her supervisors' denial of her requests for transfer or promotion, their

failure to respond to her complaints, the use of racial slurs by an employee, plaintiff's development of carpal tunnel syndrome because of defendant's failure to rotate her, and her ultimate dismissal caused her loss of sleep, hair loss, stress, depression, and chest pain.  Dkt. # 25, at 28.  These allegations of isolated incidents and displeasure with workplace decisions simply do not rise to the level of conduct as to which an Oklahoma appellate court has found extreme and outrageous conduct in the workplace setting, as liability "does not extend to mere insults, indignities, threats[,] annoyances[], petty oppressions, or other trivialities."  Mirzaie, 962 P.2d at 681.  Thus, JM Eagle is entitled to summary judgment on plaintiff's claim for intentional infliction of emotional distress.

**D.      Damages**

Defendant also asks for a limitation of plaintiff's damages to prevent her from recovering front pay or back pay.  Because defendant is entitled to summary judgment on all of plaintiff's claims, any argument as to damages is moot.

**IT IS THEREFORE ORDERED** that  Defendant's Motion for Summary Judgment and Brief in Support (Dkt. # 26) is **granted** in part and is **moot** in part: is **granted** as to all claims for relief in plaintiff's complaint; is **moot** as to defendant's request to limit damages.

**IT IS FURTHER ORDERED** that Defendant's Motion in Limine and Brief in Support (Dkt. # 27) is **moot**.

**DATED** this 29th day of November, 2010.

CLAIRE V. EAGAN, CHIEF JUDGE
UNITED STATES DISTRICT COURT

26